4083 U.S. v. Holloway. Counsel? Good morning, your honors. May it please the court. Greg Stephens here on behalf of the appellant Robert Lee Holloway. We're asking the court to reverse the district court judge's denial of the 2255 motion filed at the district court and with essentially three different remedies for each error by the district court. The court erred first in denying the motion based on the total breakdown of communications. There was in fact a total breakdown of communications that was severe and pervasive and that at the end of the representation prior just prior to trial of Mr. Holloway that was virtually non-existent and we believe that the court the district court was clearly erroneous in its conclusion that there was not a total breakdown of communications. Second, wasn't the major problem on that the breakdown of communication issue that the defendant was upset with his counsel for filing the competency inquiry? Wasn't that the essence of who caused the breakdown? I think that's how it started but I think in this case it's it's unusual that trial counsel pursued that idea not only with the initial competency evaluation where he was declared competent then enlisted the help of the psychiatrist to write a letter which didn't just say he wasn't competent it just said things that he did that were concerning to the psychiatrist and so then the trial counsel sought a second competency evaluation. In that competency evaluation the psychiatrist, again this is a different psychiatrist, concluded that he was competent and not only did it continue through that then after that that competency evaluation the trial counsel requested a hearing in front of competency because he felt that input provided by somebody who provided assistance to the psychiatrist was making statements that concerned the trial counsel. So then the judge declared that he's competent and that same idea found its way into trial counsel's defense of Mr. Holloway at trial. The defense was the theme of the defense was that Mr. Holloway was delusional and couldn't form an intent to defraud the investors. Then it also found that same theme into sentencing where he said Mr. Holloway should receive a lighter sentence because essentially he was delusional and couldn't form the intent. So not only was that the spark of the initial competency evaluation but once he was declared competent I think that trial counsel's repeated efforts to show him not to be competent was not only demonstrated the breakdown of communications but essentially trial counsel... Well doesn't counsel have an obligation to present concerns of regarding competence to the court regardless of what the client prefers? Absolutely. So the fact that he pursued that doesn't show breakdown. What were they not able to communicate about? As I understand it at one point they didn't talk to each other but they communicated through email or other correspondence. Was it email? There was email correspondence. So what were they not able to talk about? It's not even clear to me that they disagreed with respect to how to proceed in the case other than the evidence regarding competence. Well what they disagreed about was Mr. Holloway wanted to challenge the government's evidence against him and challenge the actual facts to put the government to its burden to show that he was guilty and to prove his innocence in the case. But on that issue the only real chance he had of acquittal was his state of mind. This was a white-collar crime case and the document showed that there were lots of losses and they hadn't been reported to the investors so his defense was going to have to have something to do with state of mind. Do you agree with that? I do. At least part of the defense. What the trial counsel didn't go to is the actual facts that would establish in his cross examination. It was all centered around what trial counsel thought were wacky ideas that Mr. Holloway had and whether he had the mental capacity to form the intent to defraud is different than saying I did not intend to defraud. I knew what I was doing and I didn't intend to defraud. And so by taking that away, taking that defense away, I think trial counsel usurped Mr. Holloway's autonomy to present a case that challenges the government's case. He had his own personally hired attorney with him at trial, is that correct? No. They didn't. That was in the motion to withdraw, which I think actually shows more than probably anything to break down the communications that they weren't communicating. Well that was totally the defendant's fault. He didn't tell the attorney he was going to require him to withdraw. That's right. I mean I think that's where, I think just before trial when that motion was going to be filed or when that motion, actually it was a couple, a few days late after he was informed that he no longer wanted him as counsel, that that was really the culmination of the breakdown of communications. They just, they weren't talking. Mr., sorry, trial counsel didn't inform Mr. Holloway of the new deadline for filing motions such as motions to withdraw. And at that point, as you pointed out, Mr. Holloway didn't ask or didn't inform his counsel that he had hired new counsel. But they didn't go to the counsel of his choosing at the trial. Well, you're not suggesting that blindsided him. When the magistrate judge had a discussion with him early in the case, he knew that if we were going to change counsel, it had to be much earlier than when he tried to do it. Well that was, there was an original deadline of December. And that deadline went away after the June hearing when they entered a new trial order where there was a June 23rd trial order that set new deadlines for the case. And one of the deadlines was motions, including motions to withdraw, had to be filed within 21 days. So they did, there was an old deadline. Obviously he missed it. He missed the second deadline too. But the new deadlines fall into that category that he was not informed about any, either, right? Right. Okay, so he doesn't even know about the new deadline. So he's, he's stuck with being told by the magistrate judge early in the case, you better do this early, you better do it in December. Otherwise, it's not going to happen. That's what he knew. That's what he knew. I think that's that part of the, the Romero factors that, that is, I would say neutral, but because he wasn't informed because of the breakdown in communications of the new deadline, he didn't file the motion in advance of the new deadline. You understand, you understand my point. I do, absolutely. That, that, if anything, I think it's neutral. It could cut against Mr. Holloway, but I think the breakdown in communications, which the motion to withdraw shows, that it was over a fundamental direction in this case. What do we do about things in the deciding he's going to only communicate in writing? I mean, is it fair to let him come in at the last minute and claim he should have had new counsel when it looks like he may have been gaming the system a little bit himself by these, you know, the delays he caused and the problems he caused with the communication? Well, he didn't actually, the trial wasn't delayed. He had I'm talking about delays in the communications between him and his counsel. I mean, it's possible to say, well, gosh, they didn't communicate that much, but a lot of that was, was your client's issue by not responding quickly, by only agreeing to communicate in certain ways, by being off doing things himself and not advising his counsel that he was doing them. I mean, what do we do with those? It's, it's hard to, it's hard to blame his attorney for that, isn't it? On what we have here, I think it's fair to say that the disagreement and the failure to communicate was, was the attorney's doing, because Mr. Holloway tried to communicate with him in those emails that he, the, the competency issue was over, let's prepare for trial. I want you to prepare for that. We've got a co-counsel in the case from additional appointed counsel. So his communications to trial counsel were to, to get him to defend him in the case rather than continue to pursue the idea of competency. And so I don't think it's fair to say that it's substantially his doing. I think in every case where there's a breakdown in communications, you could say, didn't he not communicate too? And sure, you could. I mean, in any, any case, both sides, the, the, the relationship between them was acrimonious and they couldn't talk on the phone anymore. They were just doing it by emails. So, I'm sorry. No, no, please. So are you viewing the case more like a McCoy v. Louisiana kind of case where you're, you think your client had the authority to direct the case or, or, you know, make a decision? I think, yes, to the extent that trial counsel did not allow him to present a case that actually defended the merits of the case as opposed to he lacked the mental capacity, essentially, to, to commit the crimes. He did have additional appointed counsel. He did. Okay, that's where I made a mistake. I thought he was chosen. Was there any problem communicating with that other attorney? It doesn't seem like there was any communication with that other attorney. He attempted at one point to speak to the trial counsel, but he wouldn't talk to him without the other counsel on the phone. So there, as far as I, what I got from the record that we have is that there was an effort, but there was no actual communication. Let me ask about one of the enhancements, the enhancement regarding the number, the enhancements of the sentence for the number of victims of the alleged fraud. There were hundreds of investors, but they didn't have individual accounts, did they? There were, there were several large groups, is that correct? How many large groups were there, three or four? There were one of the largest groups and then two sort of a little bit smaller and then one of the individual investors? There were seven individual investors who testified at trial. Who did not belong to those groups? Well, no, one of them actually was the head of one of the groups, the attorney who pled guilty. So I could see if there were hundreds of investors how it's possible that one, just because of the timing of the investment, might not have lost, but all these groups lost a lot of How could any one investor not have been a victim? Well, first the PSR actually noted that the government presented no evidence that any individual investor, right after they said that 250 individual investors were victims in the case, they said the government didn't present evidence of the loss by the individual investors. And the way that... Was it enough, wasn't it enough though to show a loss by the four investment groups? I don't think so. Because everyone invested through one of those four groups, right? They did, but let's say one person in the group suffered the loss and no one else did. How? If their investments were pooled. If their investments were... Maybe they weren't pooled, but that's my understanding is that they were pooled. So he didn't have to keep track of several hundred different accounts. He had four accounts, and there were a number of investors... It wasn't that. It wasn't hundreds of investors. It was, I would say, below 20 in each one of the groups. Well, there were a total of at least 363 investors. Right, total investors. And those 363 were, each of them was in one of the four groups, is that right? I believe so. Well, no, that's not actually true. I believe that some of those people invested individually on their own, and some of those people, of the seven, justified a trial of the individual investors. I believe that they were actually individual investors aside from the people in groups. But regardless of what the GSR says or suggests, is it at this stage of the proceedings in habeas, the burden is upon you to show that there were less than 250 investors, correct? Well, no, I think that... You don't have the burden to show there were less than 250 investors now? I don't believe we have to come... I believe it is the government's burden at sentencing to come forward with evidence that each one of these individual investors was a victim. But at this stage, it changes, doesn't it? Now it's your burden to show there were less than 250 investors. No, I think that that would get the burdens wrong in the sense that at the sentencing, it was trial counsel's job to object to the enhancement. He didn't object that... Okay, but I'm talking about prejudice. We're not talking about the first problem. I'm talking about the second problem. To show prejudice, you have to show there were less than 250 investors. No, I think for prejudice, we have to show that more victims were counted than the government presented evidence of. So in this case, they counted as victims over 250 investors. They... I don't understand. When trial counsel doesn't... And there is no record of evidence, and trial counsel doesn't object, you can't shift the burden to Mr. Holloway to now come forward with evidence that he doesn't have to show and present new evidence. What we're asking for on that... I understand you. What we're asking for on that is to remand for a hearing in the Senate. Thank you. Good morning, Your Honors. May it please the Court. Ryan Tenney on behalf of the United States. Subject to questions or directions from the Court, I think I'll just pick up with the sentencing issue where you left off, and then move backwards to the communications claim. Mr. Holloway has framed this as a failure of proof on the government's part. That may have been true if this was a direct appeal from a preserved claim, but it's not. This is an appeal from a collateral order. It's a collateral attack in a 2255 case. And as Your Honors pointed out, in the 2255 context, the burden shifts. It's now his obligation as the plaintiff in the civil lawsuit that he's filed against the United States to prove his own claim. And his claim here is an effective assistance of counsel, and more specifically, his claim is that defense counsel overlooked a valid objection. So if he's going to ask this Court to overturn his own sentence, and he bears the burden of proof to prove his own claim, he has an initial burden up front to prove that the objection that defense counsel at trial overlooked was actually valid. Because if it wasn't valid, it wouldn't have changed the guidelines calculation, and there would have been no prejudice. That's the point of the United States v. Horry. So you're conceding the first prong under Strickland? No, no. In this specific context, it ends up getting treated under the first prong. The claim is counsel overlooked a valid objection. If counsel had made the valid objection, it would have changed the guidelines range. Well, Horry says there had been this line of cases from this Court that had said, well, we're going to look to see whether the guideline range adjustment would have been significant or not. But Horry, following the lead from the United States Supreme Court, says, well, that's not the case. The prejudice under this kind of Strickland claim is the guideline move itself. But you still have to get through the first prong if you're the petitioner. And the first prong is what it always is. You've got to show that counsel overlooked a valid objection. Because if it wasn't valid, you don't end up with the guideline adjustment. And so his obligation here is to show that if counsel had actually made this objection, it would have changed something. It would actually have resulted in a determination by the District Court that there were not 250 victims. Can he get around that? I mean, the suggestion was, well, it was the government's fault because there's nothing in the record. There was a failure of the record, and therefore, that fulfills whatever obligation I might have. I think in theory he could, but I don't think he has here. I mean, I really have two different responses. They branch out a little differently analytically. Number one, he could, but he would have to produce evidence. This is the burden of proof problem. And number two, on this record. Independent of what's in the record, he has to come forward and find some evidence that there was less than 250 investors. Right. And in a 2255 case, a petitioner could make a proffer in his petition. And he could say, look, we need an evidentiary hearing. And at the evidentiary hearing, here's the facts that I'm going to produce that would show that this would have been a valid objection. That would be his burden in the 2255 petition. Couldn't you look at it by saying that the first prong with Strickland was satisfied because defense counsel did not put the government to its burden. It didn't challenge the matter. Then maybe he fails on the second prong because he hasn't shown any prejudice from the failure to put the government to its proof. Instinctively, I'm with you on that. Our reading of Horry, though, is that Horry collapses those under deficient performance. Horry says that the prejudice in this unique context sort of folds under the ordinary prejudice analysis we would have, folds under deficient performance. The question of deficient performance is, would this have been a valid objection, which is the import of your question. But once you say it would have been a valid objection, prejudice naturally follows because then you've shifted the guideline range. But I think we're getting to the same place, which is, what happens if he makes the objection? Now, let me go to the next part of your question, which is, could counsel have validly chosen on this record to not make the objection? And this is really the gravamen of his claim. His claim is, look, at a bare minimum, defense counsel has an obligation to, quote, hold the government to its burden of proof. And that's the thrust of his claim, that at a bare minimum, the government bore the burden to prove its case of sentencing, and defense counsel should at least have said, prove it. The problem analytically is its foundation. Its foundation is the suggestion that defense counsel always has to hold the government to its burden of proof. It doesn't. Defense counsel routinely chooses not to object to things. In fact, moving beyond that, defense counsel routinely will stipulate to things. It's common in a criminal trial, for example, to see a joint stipulation of fact read to the jury. And that joint stipulation might have bad facts. It's common to see defense counsel concede things. So you're characterizing the claims here made by Holloway that they say you have to object to everything. Well, he's at least saying here that the problem was that defense counsel did not put the government to its burden of proof. That's the phrase he uses throughout his briefing. And he's doing so in part, I think, because he did not produce affirmative proof in his 2255 petition. So the claim he wants to rest on is, look, if the government's burden below to prove this thing, it hadn't produced the affirmative proof. So therefore, defense counsel had an obligation to object to it. And the point that I'm trying to make, even if you just characterize it that way, the point that I'm trying to make is that there are a variety of circumstances in both the trial process and the sentencing process in which defense counsel will commonly stipulate to elements or defenses or facts and not put the government to its burden of proof. They'll stipulate to jurisdiction or chain of custody, or they'll stipulate that the drugs were indeed the kind of drug that was alleged. In an affirmative defense case, they'll stipulate that all of the elements of the crime were met so that they can then focus on the proposed affirmative defense. And so if Strickland says, and it does, that we look at these cases under the circumstances of the individual case, the point that I'm trying to make is that there are a variety of circumstances under which defense counsel can reasonably and constitutionally decide to not put the government to a burden of proof. There's a bunch of reasons. Number one, they might think that the proof is strong, so it's not worth making the objection. Two, they might want to curry favor with the court or with the jury by not objecting too much. Or three, sometimes it's just a framing mechanism. We're trying to get the fact finder or the trier of fact to look here, not there. And in the sentencing context, there's a particular resonance. And I think that's what was going on here. Defense counsel was trying to get the sentencing court to look at Holloway sympathetically. That's the point. And if you read the sentencing transcript, you see this. They produced letters, a number of letters, according to the trial judge, from friends and family. He has Holloway allocuted. Holloway's fiancee addresses the court. And the thrust of that pitch is he's a good guy. He didn't mean to hurt these people. He got in over his head. If on the eve of sentencing you ask the government to produce 250-plus victim statements or a chart detailing how many people lost money and how much they lost, that undercuts that. And so defense counsel could plausibly look at this and say, you know, I'm not going to make this objection, just like I might stipulate to a bad fact or stipulate to a chain of custody or whatever. This, though, is something that had severe consequences by not objecting to this enhancement. You agree with that, don't you? I do agree. I mean, so even if he is trying to, as much as you want to curry sympathy and favor with the sentencing judge, it's perilous to stick your client out there for a large enhancement. Right. All right. So while what you're saying may theoretically be true, this really isn't the case for that, I don't think. I would push back on the last part and let me explain why. Strickland says that you assess the reasonableness of counsel's decisions based on what counsel knew at the time. And the baseline standard is objective reasonableness. If you can conceive of a reasonably competent attorney looking at this corpus of record evidence and deciding this, then there's no Strickland claim. Well, here's what counsel knew. Counsel knew what had been said at trial because everything that happens after is too late. So what we have at trial are the following. Testimony that there was over $15 million in losses. Testimony that there were at least 363 investors. Testimony that each of the four groups had lost a significant percentage of their money. There were multiple witnesses who testified at trial that they lost money. Not a single witness had come forward to say that they had not lost money. And finally, Holloway's own defense. Holloway's defense, which was set forth in his emails and in the arguments and so forth, was that he really believed that if he could just invest all this money, that eventually his investment strategy would pay off and that he'd turn a profit. Well, that required him to be investing the money, not to be giving it back. He couldn't have been simultaneously investing all of this money and giving it back to the people. But he was giving some of it back. He was giving some of it back. Meaning there were at least shades of Ponzi here. Right. But he says in an email that he's running a Ponzi scheme to one of his insiders. But the point here is that under the guideline, the word it uses is any. A victim is somebody who has suffered any part of the loss. And so if he's turning all this money back into his investment, he's not going to be simultaneously giving them all of their money back. And so to come back to your question, Judge Carson, I agree with you in principle, to come back to the theory part, that this is a pretty significant guideline shift. And if the evidence looks to counsel like it was going to change something, it was really going to be valid, then sure, there may be a circumstance in which that would be a stripping problem. Let me mention one. It seems to me that even if one of the earlier investors got some money back, since this was a Ponzi scheme, any gains that that person made would be clawed back in the receivership or whatever happened. And that's another problem. And this goes into the calculus. And this is the point I wanted to make about Judge Carson's question. Look, defense counsel could have objected. But he's weighing the odds of it succeeding. And on this record, where the government only needed to prove by a preponderance the sentencing enhancement, it only needed to prove that it was more likely than not. If he's looking at all of those facts and he's thinking, is it more likely than not that 250 people didn't suffer some loss, the answer is probably no. It looks like a lot of people suffered loss. So if I make this objection, it's going to undercut my sentencing argument. It's probably not going to work. It's not worth it. That's a valid decision. As long as you think reasonably competent counsel can decide that, that ends the inquiry. Would you take some time to address the breakdown? Please, yes. He's briefed this. He makes this clear on pages 40 to 41 of his brief, that this is a chronic claim, not a strict claim. That matters. Under strict one, you have to prove both elements, deficient performance and prejudice. But under chronic, you don't have to prove prejudice. But the problem from a defendant and such petitioner's end is that there's a higher initial burden under chronic. Chronic requires not just tension between counsel, not just disagreements between counsel and client, but it requires, this is the phrase, an actual breakdown in the adversarial process. We quoted that in our brief. There's another passage at the close of the chronic opinion. It's the last paragraph of the opinion that says that the Sixth Amendment is violated in the sense of, quote, counsel failed to function in any meaningful sense as the government's adversary. This is why chronic says that in this context, you don't have to prove prejudice. Because if you have this kind of claim, there's no adversarial testing, it makes sense to presume prejudice. So on a communications claim that falls under chronic, it's not enough to show a disagreement with counsel. There's no Sixth Amendment right under the chronic cases to agree with your counsel about everything or most things. You have to show something beyond that. You have to show that there was a, quote, complete breakdown in communications or a total breakdown in communications. Are you saying that in a chronic case, as long as there's a principled approach in the defense counsel's strategy, that that defense counsel can completely reject his or her client's suggestion of a different strategy? Because they're not totally absent, they're just having a disagreement, and the lawyer says, I'm going to do it my way, not your way. As long as we're clear about where strategy means yes, the answer to your question is yes. And here's why. It's because of McCoy. McCoy says that the defendant gets to decide the objective, and then the counsel gets to decide how to get there. That's the strategy part. There's no requirement under chronic that the defendant agree with that strategy approach. Now, I want to make a caveat. But at least it has to be a principled approach. It has to be a principled approach. But here's the way that the defendant gets a remedy in your scenario. If counsel's preferred strategy, the chosen strategy, is objectively unreasonable, you can make that claim, but it's not a chronic claim. It's a Strickland claim. Strickland talks about this very specifically. It's got the language about not every counsel would decide on the same approach. The Supreme Court has recently addressed it in Harrington v. Richter. It has this extensive discussion about how counsel has these different options, and they can choose it. So if Mr. Holloway here, to bring it back to this case, had wanted to claim my counsel's strategy, his chosen strategy, was objectively unreasonable, that would have been a Strickland claim. But he hasn't briefed it that way. He hasn't pleaded it that way. But he could have challenged that. He just didn't. But if he wants to pull it under chronic, which he wants to because it gets him out of prejudice, if he wants to pull this under chronic, he's got to show more. He's got to show more than just about strategy. He's got to show, quote, a complete breakdown in communication that prevented the preparation of a meaningful defense. It's a different kind of claim than just simply pointing to a strategy. Is a petitioner under 2255, does the petitioner have the power to plead alternative claims? Yes. Strickland and chronic? Absolutely. But that can be a problem. Sorry? That can be a problem for the petitioner on conflicting approaches. Well, there's case law that talks about how both a trial and a sentencing, you can advance conflicting approaches. And I guess in theory, there could be a circumstance where it breaks out. He hasn't done that. He pleaded this under chronic, and so he's got to show more than disagreement. I see that I'm out of time. I'd be happy to answer any questions. Can I ask you one question about the Brady? I want to ask you one question about the Brady issue. Please. Did the government make any contact with the receiver to find out if the receiver had any kind of exculpatory evidence? Or is it your position that you just had no burden to go to the receiver at all? When you say government. Oh. In the prosecutor that was working with the receiver, or purportedly, do you know if there is any evidence that the prosecution team went to the receiver to find out if there was exculpatory evidence that might be provided to the defendant? I'm not aware of anything in the record that says that that happened. But if I may, I recognize I'm out of time, but if I may point out why I don't think that's a problem here. If Mr. Holloway wanted to file a claim saying that the government had this and it failed to provide it, that claim would be under the discovery rules, under the rules of criminal procedure. He's got access under the rules of criminal procedure to find out what it is the government has. What he doesn't have the ability to do is turn that into a Brady claim. I mean, this is the point of those cases, is the discovery obligations of the government fall under the procedure rules. But Brady doesn't exist to constitutionalize those. What Brady exists to do is say, look, you've discovered this thing. Now we're going to discuss the constitutional import of it. He's trying to short-circuit that and use Brady to bypass the rules, and that's what they don't allow. But there's nothing in the record to answer your question. Okay, thanks. Thank you. You went over a little bit. You've got a minute if you have something you want to say. He went over, too. Yeah, but not that long. On the Brady issue, Mr. Holloway discovered that there wereóhe was given some things from the receiver during the course of the discovery process. He was given some documents from the receiver, and those were the things about which the receiver testified at trial, and that he provided information to the prosecution team. What he didn't knowóand he learned this when he was dealing with the restitution issue after trial in a civil caseó with his counsel that were listed on the receiver's affidavit for fees. And so that's why this came up after trial as opposed to before. I think everyone assumed that the prosecution had turned over the documents that the receiver had. And as counsel pointed out, the government's counsel pointed out, we don't know whether an inquiry was made to find out if there was an exculpatory. On the enhancement issue, I thinkó That's your minute. Is thatóokay. Thank you, everyone. Thank you, counsel. Case is submitted. Counsel are excused.